UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-24131-Civ-COOKE/TORRES

KENNETH GOODE,

    Plaintiff,

v.

CELEBRITY CRUISES, INC. *et al*,

    Defendants,

v.

AKIRA ENTERTAINMENT, INC.,
a foreign corporation,

    Third-Party Defendant.
_____/

## **ORDER ON PLAINTIFF'S MOTION TO COMPEL**

This matter is before the Court on Kenneth Goode's ("Plaintiff") Motion to Compel ("Motion") [D.E. 58] against Poet Holdings, Inc. and/or Poet Technical Services, LLC, a foreign corporation (collectively, "Poet"), a group of related companies involved in the production of live entertainment. Poet responded to Plaintiff's Motion on July 31, 2017 [D.E. 62] to which Plaintiff replied on August 7, 2017. [D.E. 68]. Therefore, Plaintiff's Motion is now ripe for disposition. After careful consideration of the Motion, response, reply, relevant authority, and for the reasons discussed below, Plaintiff's Motion is **GRANTED in part** and **DENIED in part**.

1

# I. BACKGROUND

Plaintiff, a Canadian citizen, filed this action on September 27, 2016. Plaintiff worked as a carpenter onboard a ship owned and operated by Celebrity Cruises, Inc. ("Celebrity") and claims that he was directly paid by Akira Entertainment, Inc. ("Akira") in connection with the removal of theater and lighting equipment from the M/S Equinox.[1] The removal of the equipment was supposedly necessitated by the conclusion of a contractual relationship between Poet and Celebrity, whereby Poet produced various entertainment shows on five separate Celebrity-owned vessels, including the M/S Equinox.

Following the conclusion of the business relationship between Poet and Celebrity, Celebrity was contractually obligated to return all equipment, including set pieces, costumes, props, and flying motors to Poet. In order to return Poet's equipment and allow for the installation of new equipment, Celebrity contracted directly with Akira to provide the necessary labor for removal and/or installation of the equipment. Celebrity allegedly contracted with Akira for two separate reasons: (1) Celebrity lacked sufficient personnel with the requisite knowledge and experience to remove and/or install the equipment, and (2) Celebrity was unwilling to hire Poet to remove Poet's own equipment because Poet's rates were too expensive.

Thereafter, Akira hired Plaintiff, in addition to other individuals, as a carpenter and to serve as a member of its workforce upon the M/S Equinox.

---

[1] Plaintiff alleges that Akira functioned merely as a pay-roll employer and that Celebrity and/or Poet were his actual and/or borrowed employer(s).

Plaintiff had previously and continuously worked for several weeks removing equipment onboard two of Celebrity's other ships, the M/S Solstice and the M/S Eclipse. Plaintiff was also scheduled to work on two additional Celebrity ships, the M/S Silhouette and the M/S Reflection. In other words, Plaintiff's initial contract was to work on five vessels in Celebrity's fleet.

On November 10, 2015, Plaintiff was working on the tension grid located in the theater of the M/S Equinox.[2] While performing the required work, Plaintiff fell through an opening in the tension grid when another Akira employee removed one of the grid posts. Plaintiff purportedly suffered serious physical injuries as a result of the fall. Plaintiff fell approximately 25 to 30 feet to the theatre floor sustaining broken wrists, broken ankles, multiple fractures in his back and neck vertebrae, and other significant trauma. Following the incident and the transport of Plaintiff off the M/S Equinox, Plaintiff performed no further work for Akira in connection with the removal and/or installation of equipment on Celebrity owned vessels.

On May 5, 2017, Plaintiff served Poet his interrogatories and requests for production of documents. On June 16, 2017, Poet served responses and raised thirteen general objections with respect to each interrogatory and request for production. Following service of Poet's responses, Plaintiff's counsel requested a meet and confer that was held by telephone between the two parties. Because the parties reached an impasse on the proper scope of discovery, Plaintiff filed his Motion on July 17, 2017.

---

[2] Plaintiff alleges that Celebrity and/or Poet employed Plaintiff to serve as a Jones Act Seaman or a seaman under General Maritime Law.

## II. APPLICABLE LEGAL PRINCIPLES AND LAW

Under the Federal Rules, a party may pose interrogatories related to any matter into which Rule 26(b) allows inquiry, FED. R. CIV. P. 33(a)(2), request the production of any documents that fall within the scope of Rule 26(b), FED. R. CIV. P. 34(a), and serve requests to admit certain matters within the scope of Rule 26(b)(1), FED. R. CIV. P. 36(a)(1). Rule 26(b) also allows discovery "through increased reliance on the commonsense concept of proportionality." *In re: Takata Airbag Prod. Liab. Litig.*, 2016 WL 1460143, at *2 (S.D. Fla. Mar. 1, 2016) (quoting Chief Justice John Roberts, *2015 Year–End Report on the Federal Judiciary 6* (2015)). "Proportionality requires counsel and the court to consider whether relevant information is discoverable in view of the needs of the case." *Tiger v. Dynamic Sports Nutrition, LLC*, 2016 WL 1408098, at *2 (M.D. Fla. Apr. 11, 2016). If the opposing party objects to interrogatories or requests, the requesting party may then file a motion to compel production pursuant to FED. R. CIV. P. 37, but only after its counsel, in good faith, confers with opposing counsel to resolve discovery disputes without court intervention. *See* FED. R. CIV. P. 37(a)(1).

The Federal Rules afford the Court broad authority to control the scope of discovery, *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1307 (11th Cir. 2011), but "strongly favor full discovery whenever possible. *See Farnsworth v. Procter & Gamble Co.*, 758 F.3d 1545, 1547 (11th Cir. 1985). Courts must consequently employ a liberal and broad scope of discovery in keeping with the spirit and purpose of these rules. *See Rosenbaum v. Becker & Poliakoff, P.A.,*

4

708 F. Supp. 2d 1304, 1306 (S.D. Fla. 2010) (collecting cases). The "overall purpose of discovery under the Federal Rules is to require the disclosure of all relevant information, so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts, and therefore embody a fair and just result." *State Nat'l Ins. Co. v. City of Destin*, 2015 WL 11109379, at *1 (N.D. Fla. Sept. 1, 2015).

However, while the scope of discovery is broad, it is not without limits. *See Washington v. Brown & Williamson Tobacco*, 959 F. 2d 1566, 1570 (11th Cir. 1992); *Rossbach v. Rundle,* 128 F. Supp. 2d 1348 (S.D. Fla. 2000) (citing *Oppenheimer Fund v. Sanders*, 437 U.S. 340 (1978)). To show that the requested discovery is otherwise objectionable, the onus is on the objecting party to demonstrate with specificity how the objected-to request is unreasonable or otherwise unduly burdensome. *See Rossbach*, 128 F. Supp. 3d at 1354 (citing in part *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1559 (11th Cir. 1985)).

Boilerplate objections and generalized responses are improper. *See Alhassid v. Bank of America*, 2015 WL 1120273, at *2 (S.D. Fla. March 12, 2015). This District has frequently held that objections which fail to sufficiently specify the grounds on which they are based are improper and without merit. *See, e.g., Taylor v. Bradshaw,* 2014 WL 6459978 (S.D. Fla. Nov. 14, 2014); *Abdin v. Am. Sec. Ins. Co.*, 2010 WL 1257702 (S.D. Fla. March 29, 2010). More specifically, objections simply stating that a request is "overly broad, or unduly burdensome" are

5

meaningless and without merit. *Abdin*, 2010 WL 1257702 at *1 (quoting *Guzman* v. *Irmadan, Inc.*, 249 F.R.D. 399, 400 (S.D. Fla. 2008)).

In addition to the Federal Rules, Southern District Local Rule 26.1 controls the necessary procedure a party must follow when objecting to a request for production or asserting a claim of privilege. It requires that:

> All disputes related to discovery shall be presented to the Court by motion (or, if the Court has established a different practice for presenting discovery disputes, by other Court-approved method) within (30) days from the: (a) original due date (or later date if extended by the Court or the parties) of the response or objection to the discovery request that is the subject of the dispute; (b) date of the deposition in which the dispute arose; or (c) date on which a party first learned of or should have learned of a purported deficiency concerning the production of discovery materials. Failure to present the dispute to the Court within that timeframe, absent a showing of good cause for the delay, *may* constitute a waiver of the relief sought at the Court's discretion. The thirty (30) day period set forth in this rule may be extended once for up to seven (7) additional days by an unfiled, written stipulation between the parties, provided that the stipulation does not conflict with a Court order.

S.D. Fla. L.R. 26.1(g) (emphasis added). On its face, Rule 26.1(i) is therefore plainly discretionary. While the grounds for a motion tends to be the moment at which responses are filed, this is not always necessarily the case. *See, e.g.*, *Socas v. Northwestern Mut. Life Ins.*, 2008 WL 619322 (S.D. Fla. March 4, 2008) (finding that the occurrence triggering the motion to compel was when the requesting party examined certain documents months after their initial requests had been answered); *United States v. Polo Pointe Way, Delray Beach, Fl.*, 444 F. Supp. 2d 1258, 1261 (S.D. Fla. 2006) (finding that the "occurrence" at issue was a deposition that took place after responses were filed).

6

In pertinent part, the Local Rules also provide that where a claim of privilege is asserted, the objecting party must prepare "a privilege log with respect to all documents, electronically stored information, things and oral communications withheld on the basis of a claim of privilege or work product protection" except for "*written and oral communications between a party and its counsel after commencement of the action and work product material created after commencement of the action.*" S.D. Fla. L.R. 26.1(e)(B)(i) (emphasis added). Furthermore, "[w]here a claim of privilege is asserted in objecting to any . . . production demand . . . and an answer is not provided on the basis of such assertion . . . [t]he attorney asserting the privilege shall . . . identify the nature of the privilege . . . being claimed." S.D. Fla. L.R. 26.1(e)(B).

### III. ANALYSIS

The gist of Plaintiff's Motion is that he believes he is entitled to information from Poet during the entirety of the time that Poet's equipment was being removed from Celebrity's ships, including any work done *after* Plaintiff was injured. Thus, Plaintiff requests information on future periods of time when Plaintiff was scheduled or anticipated to work on Celebrity's ships. Plaintiff argues that the mere fact that discovery seeks information concerning jobs which Plaintiff did not participate in due to his injury does not render the discovery unimportant. Rather, Plaintiff contends that discovery as to how similar jobs were conducted as between Poet and Celebrity may shed a tremendous amount of light on how the accident in question could have been prevented and how the job was or should have been

7

supervised. Part of this inquiry supposedly involves the policies that were in play prior to Plaintiff's traumatic injuries and those that were in place afterward. In other words, Plaintiff states that the Court should look to the duration of Plaintiff's intended connection to the vessel in deciding on the proper scope of discovery in this action.[3]

As support, Plaintiff relies on the Supreme Court's decision in *Chandris, Inc. v. Latsi*s, 515 U.S. 347 (1995), where the Court decided the question of what constitutes a "seaman" under the Jones Act. The Court held that the test to determine if a worker is a "seaman" depends on two elements: "The worker's duties must contribute to the function of the vessel or to the accomplishment of its mission, and the worker must have a connection to a vessel in navigation (or an identifiable group of vessels) that is substantial in terms of both its duration and its nature." *Id*. at 376. As such, Plaintiff argues that *Chandris* stands for the proposition that courts should not employ a "snapshot" test when evaluating the relevancy of documents produced in discovery:

> [W]e can imagine situations in which someone who had worked for years in an employer's shoreside headquarters is then reassigned to a ship in a classic seaman's job that involves a regular and continuous, rather than intermittent, commitment of the worker's labor to the function of a vessel. Such a person should not be denied seaman status if injured shortly after the reassignment, just as someone actually

---

[3] A separate dispute between the parties is that Poet allegedly did not adequately respond to interrogatory 24, which inquired if Poet or any of its employees followed proper procedures at the time of Plaintiff's accident. Poet responded that the request was vague and that other employees working near the area where Plaintiff fell were completing unrelated tasks. As such, Poet believes that it has adequately responded to interrogatory 24 and that Plaintiff's argument holds no merit.

> transferred to a desk job in the company's office and injured in the hallway should not be entitled to claim seaman status on the basis of prior service at sea.

*Id.* at 372.

The Court ruled that "[i]n evaluating the employment-related connection of a maritime worker to a vessel in navigation, courts should not employ 'a 'snapshot' test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated in the jurisprudence.'" *Id.* at 363 (quoting *Easley v. S. Shipbuilding Corp.*, 965 F.2d 1 (5th Cir. 1992)). Therefore, Plaintiff argues that *Chandris* forecloses Poet's argument that the proper scope of discovery need not involve any future projects that Plaintiff would have worked on had he not been injured. *See also Hufnagel v. Omega Serv. Indus., Inc.,* 182 F.3d 340, 346 (5th Cir. 1999) ("[S]eaman-status is determined by the employee's entire employment-related connection to a vessel, and not by the immediate circumstances or location of the plaintiff's injury.") (alteration added) (citing *Chandris,* 515 U.S. at 363); *Stewart v. J.E. Borries, Inc.,* 2007 WL 2915033, at *5 (S.D. Miss. Oct. 4, 2007) (rejecting defendant's argument that the relevant time period is a particular assignment, as "[t]he general rule is that the entire employment history with a particular employer is analyzed") (alteration added) (citing *Becker v. Tidewater, Inc.,* 335 F.3d 376, 388–89 (5th Cir. 2003)).

In response, Poet objects to Plaintiff's discovery requests in connection with the ships that Plaintiff was scheduled to work on in the *future* – the M/S Silhouette

9

and the M/S Reflection.[4] Poet argues that Plaintiff's request goes far beyond the legal questions at issue in this action, which allegedly center on who was Plaintiff's employer and/or supervisor at the time of Plaintiff's fall. Poet also suggests that, even if documents from the post-incident ships discussed changes to the method by which Plaintiff's next jobs were accomplished, they would be of no relevance on the question of who was Plaintiff's employer at the time of the incident. Hypothetically, if a material change was made to the arrangement between Celebrity, Poet, and Akira following the incident, Poet states that such a change would not impact the determination of who was in charge of Plaintiff at the moment Plaintiff fell. As such, Poet believes that Plaintiff's requests are a mere fishing expedition meant to burden Poet and seek some form of prejudicial, post-incident document. Because the central question in this case is allegedly not how Plaintiff's incident could have been prevented, but instead who was responsible for Plaintiff at the time of the incident, Poet argues that documents relating to the post-incident ships have no relevance to this action.

Poet further argues that the Supreme Court's decision in *Chandris* is irrelevant to the facts of this case. Poet contends that the Court was merely making a determination that involved a long-term employee who had worked in a land-based job that involved substantive travel at sea and then injured shortly thereafter. Poet suggests that *Chandris* is not remotely related to the facts

---

[4] However, Poet acknowledges that it has agreed to produce discovery in connection with the two ships that Plaintiff worked on in the *past* – the M/S Solstice and the M/S Eclipse.

10

presented because it dealt with employees who were reassigned and/or moved between land-based and sea-based duties. In other words, Poet believes that *Chandris* is so factually distinguishable that it has no bearing on the discovery available to post-incident ships.

Moreover, Poet contends that Plaintiff is mistakenly equating the question of the *duration* of Plaintiff's employment with a right to obtain extensive and irrelevant discovery. Poet argues that it is not contending that Plaintiff did not intend to work on all five Celebrity ships at issue and therefore the question of how long Plaintiff was to be employed with Akira is purportedly not in dispute. Poet also suggests that Plaintiff continues to conflate the standard with respect to a Plaintiff's Jones Act claim – as discussed in *Chandris* – with discovery. Poet acknowledges that it does not dispute the holding in *Chandris* and the fact that a Jones Act claim involves an examination of the entire employment history with an employer.

However, Poet suggests that Plaintiff is incorrect in stating that he has the right to post-incident discovery when his allegations against Poet are that Poet was his *borrowing employer* at the time he was injured – not his Jones Act employer. Poet believes that Plaintiff's allegations make clear Plaintiff was not hired or paid by Poet and that Plaintiff was not employed by Poet – in the traditional sense – at any point in connection with the five Celebrity ships. As such, Poet suggests that any documentation that it possesses with regard to future ships that Plaintiff would have worked on has no bearing on the status that Plaintiff achieved prior to his

11

injury. In sum, Plaintiff's allegation that he was hired by another party as a Jones Act employee and that he was a *borrowed* employee of Poet is purportedly a limited inquiry and deserves limited discovery.

In reply, Plaintiff takes issue with Poet's argument because the concept of relevancy is allegedly not so constrained. Plaintiff suggests that the liability issues in this case rely precisely on how and why Plaintiff fell on the vessel. And Plaintiff believes that understanding how and why such a traumatic injury occurs can certainly be explained by the policies that were in place *prior* to that time, as well as the policies that were in play *after* that time. Plaintiff further argues that the fact that it is undisputed that Plaintiff was not employed by Poet in the traditional sense is irrelevant because it is obviously presumed that Defendant may have been the borrowing employer and therefore liable for Plaintiff's injuries. As such, Plaintiff contends that Poet's arguments have no merit and that Poet should be compelled to produce responsive documents with respect to any ships that Plaintiff worked on before the incident and would have worked on after the incident.[5]

Generally, the status of an employee who splits time between a vessel and land is "determined in the context of his *entire* employment with his current employer." *Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067, 1075 (5th Cir. 1986) (emphasis added) (internal quotation marks omitted). But if an employee "receives a new work assignment before his accident in which either his essential duties or

---

[5] The breadth of Plaintiff's argument is somewhat confusing because Poet agreed to produce documents in connection with the two ships that Plaintiff worked on in the past – the M/S Solstice and the M/S Eclipse.

his work location is *permanently changed,* he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new job." *Barrett,* 781 F.2d at 1075–76 (emphasis added); *see also Chandris,* 515 U.S. at 371–72 ("[W]e see no reason to limit the seaman status inquiry . . . exclusively to an examination of the overall course of a worker's service with a particular employer. When a maritime worker's basic assignment changes, his seaman status may change as well."). This exception applies only when an employee has "undergone a *substantial change* in status, not simply [by] serv[ing] on a boat sporadically." *Becker,* 335 F.3d at 389 (emphasis added).

In cases involving a borrowing employer, we agree with the Fifth Circuit that there is no "bright-line rule that courts performing the seaman-status inquiry must always look to an employee's entire employment with his nominal employer rather than his borrowing employer," and "we also decline to adopt a rule that borrowed-employee status automatically requires courts [to] look only to his period of employment with the borrowing employer." *Wilcox v. Wild Well Control, Inc.*, 794 F.3d 531, 538 (5th Cir. 2015). Instead, the specific facts of each case, especially one where the allegations involve a borrowing employer, must guide courts to determine whether an employee's entire employment is relevant or not.

Here, neither party disputes the fact that Plaintiff was not Poet's employee in the traditional sense. In fact, the record evidence suggests that Poet did not pay Plaintiff, made no arrangements for Plaintiff's travel, and had little to do with Plaintiff outside of being present on the ships where he actually worked. More

13

importantly, this is not a case where Plaintiff seaman's status is necessarily in dispute since all of Plaintiff's contractual work consisted of his work on five of Celebrity's ships. Plaintiff never mentions any land based work that calls into question whether Plaintiff would be a seaman or not. And any documentation maintained by Poet would not change the analysis of the arrangement between Celebrity, Poet, and Akira following the incident. In other words, the most critical question with respect to Poet is who was in charge of Plaintiff at the moment Plaintiff fell. Because Plaintiff's allegations against Poet are tethered to that question and Poet agreed to produce documents for the two ships that Plaintiff worked on prior to his fall, we find that Plaintiff's discovery requests in connection with the two ships that Plaintiff would have worked on in the future are not relevant given the facts presented. As such, Plaintiff's Motion, on this basis, is **DENIED**.

The final dispute between the parties is whether Poet adequately responded to Plaintiff's interrogatory 24:

> Was Poet and/or any of its employees or agents following work aloft or other procedures at the time of Plaintiff's accident. If so, please describe these procedures. If not, please explain why.
>
> Poet objects to the demand as being vague. Notwithstanding Poet's objections, Poet employee William Lee Jon Taylor was located in the vicinity of the tension grid at the time that the incident occurred. Mr. Taylor was performing work unrelated to the work being performed by Plaintiff and other Akira employees who were located on the grid. Poet reserves the right to supplement and/or amend these responses up to, and including, the time of trial.

14

Based on the answer to interrogatory 24, we agree with Plaintiff that Poet's response is not responsive. Poet's response is insufficient because it briefly touches upon an employee and states that he was performing unrelated work. Poet noticeably avoids any discussion of whether that employee – or anyone else – was following any procedures in fulfilling their job duties. Poet's response, as it stands now, is unhelpful and is akin to no response at all. To this extent, Plaintiff's Motion is **GRANTED** and Poet's response must be amended to fully and completely answer the question.

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion to Compel is **GRANTED in part** and **DENIED in part**. [D.E. 43]. Poet is compelled to amend its response to Plaintiff's interrogatory 24 within fourteen (14) days from the date of this Order. To this extent, Plaintiff's Motion is **GRANTED**. As for Plaintiff's request to compel Poet to produce documents in connection with ships that Plaintiff never worked on, Plaintiff's Motion is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 9th day of August, 2017.[6]

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

---

[6] Because the Court has resolved the current dispute without the necessity for a hearing, Plaintiff's motion for a hearing [D.E. 59] is **DENIED as moot**.